## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

PINNACLE COMMUNICATIONS
INTERNATIONAL, INC., a Florida
corporation,

        Plaintiff,


v.                       **MEMORANDUM OF LAW & ORDER**
                             Civil File No. 04-673 (MJD/AJB)

AMERICAN FAMILY MORTGAGE
CORPORATION, a Minnesota
corporation, and MICHAEL SCHNEIDER,

        Defendants and Third-Party Plaintiffs,

v.

WILLIAM LEVINE,

        Third-Party Defendant.

_____

Scott A. Johnson and Todd Maurice Johnson, Johnson Law Group LLP, Counsel for Plaintiff Pinnacle Communications International, Inc., and Third-Party Defendant William Levine.

Mark N. Stageberg, Counsel for Defendants and Third-Party Plaintiffs American Family Mortgage Corporation and Michael Schneider.

_____

## I.     INTRODUCTION

This matter is before the Court on three motions for summary judgment:

Motion for Summary Judgment and Dismissal of Counterclaims and Third Party

Claims by Pinnacle Communications International, Inc. [Docket No. 78], Motion

for Entry of Summary Judgment against American Family Mortgage Corporation

and Michael Schneider by Pinnacle Communications International, Inc. [Docket

No. 94], and Motion for Summary Judgment by American Family Mortgage

Corporation and Michael Schneider [Docket No. 102].  Also before the Court is

Pinnacle's Motion to Strike Affidavits as Hearsay Testimony and Lacking in

Foundation [Docket No. 122].  The Court heard oral argument on January 30,

2006.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   Pinnacle's Private Offering

Plaintiff Pinnacle Communications International, Inc. ("Pinnacle") is a

Florida corporation that operates a shopping web site entitled Shop4zero.

Defendant American Family Mortgage Corporation ("AFM") is a Minnesota

corporation that originates and provides mortgage products to consumers.  It is

licensed in both Minnesota and Arizona and is headquartered in Minnesota.

Defendant Michael Schneider is the president of AFM.

#### 2.   Pinnacle's Meetings with AFM

Beginning in 2000, Pinnacle attempted to raise investment capital by

presenting a private placement to investors without a public offering.  Pinnacle

and its attorneys prepared a Private Placement Memorandum ("PPM") and other documents to present to potential investors.

In October 2003, Pinnacle's president, Third-Party Defendant William Levine, traveled to Minnesota and met with Schneider to solicit his investment in Pinnacle. On October 7 or 14, 2003, Levine and Schneider met for a couple of hours to discuss the investment. Peter Jesh, an independent marketing representative for Pinnacle, also attended the meeting.

### 3.    Subscription Agreements and Shareholders Agreement

The next day, Jesh met with Schneider and provided four Subscription Agreements. At that time, Schneider signed all four Subscription Agreements on behalf of AFM. He also signed a Shareholders Agreement. Although Schneider signed the four Subscription Agreements on the same date, he dated the first Subscription Agreement October 15, 2003, the second one November 15, 2003, the third one December 15, 2003, and the fourth one January 10, 2004.

Pinnacle submits copies of the agreements showing that Schneider signed pages four, seven, and eleven of all four Subscription Agreements, initialing each one to represent that AFM had sufficient net worth to qualify as an "accredited investor." Defendants assert that although Schneider did sign all pages of the first Subscription Agreement, and page seven of all four Subscription Agreements, he did not sign pages four or eleven of the second, third, or fourth Subscription

Agreements.  Instead, they allege that Pinnacle photocopied those pages from the first Subscription Agreement and inserted them into the other three.

Page four of each Subscription Agreement contains an affirmation that the investor is accredited, that is, was not formed for the specific purpose of acquiring the shares and has total assets in excess of $5,000,000.  Page eleven, the Counterpart Execution Page to Shareholders Agreement, contains as affirmation that the investor acknowledges receipt of, has reviewed, and agrees to be bound by the Shareholders Agreement.  Page eleven further states that it will be attached to and become part of the Shareholders Agreement.

The Shareholders Agreement contains an integration clause stating:

> Entire Agreement.  Except as otherwise expressly set forth herein, this Agreement embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

(Shareholders Agreement ¶ 12.)

Together, the four Subscription Agreements obligated AFM to pay $480,000 for Pinnacle stock.  Each Subscription Agreement states that AFM "should submit a check in the full amount of the purchase price for the Shares that you are purchasing payable to 'Pinnacle Communications International, Inc.'" (Subscription Agreement at 2.)  The contract explains that "[c]ompleted

subscription documents, together with your check, should be returned to William

A. Levine."  (Id.)

Each Subscription Agreement contains representations that AFM had

received and reviewed the PPM.  They further affirmed that AFM's decision to

invest was based solely on the PPM:

> I have based my decision to invest on the information contained in
> the Private Placement Memorandum, and no oral or written
> representations have been made or oral or written information
> furnished to me in connection with this offering, which were in any
> way inconsistent with the information contained in the Private
> Placement Memorandum.

(Subscription Agreement ¶ 12.)

### 4.    Private Placement Memorandum

Schneider received a copy of a PPM before he signed the Subscription

Agreements; however, he did not read or rely on the PPM before signing them.

The parties disagree on which version of the PPM was provided to AFM.  Pinnacle

asserts that AFM received the updated September 16, 2003 version of the PPM,

while Defendants claim that AFM received the June 12, 2002 version.

### a.    September 2003 PPM

Pinnacle claims that it presented AFM with the version of the PPM that had

been updated on September 16, 2003 ("September 2003 PPM").  Various pages in

the PPM provide that the private placement offering could be or had been

extended through the end of December 2003.  In December 2002, and again in

February 2003, Pinnacle's Board of Directors extended the offering for the amount of time necessary to complete the offering.

### b.      June 2002 PPM

Defendants assert that Pinnacle provided AFM with an earlier version of the PPM dated June 12, 2002 ("June 2002 PPM").  Various pages in the June 2002 PPM state that the private placement offering could be or had been extended through the end of September 30, 2003.

### c.      Statements Contained in Both PPMs

Both PPMs state that

the Shares are intended only for, and the Shares are offered only to, investors who fall into one of the following categories of 'accredited investors' as defined by Regulation D under the Act:

* * *

(5) The investor is . . . (i) an organization described in Section 501(c)(3) of the Internal Revenue Code, or a corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Shares with total assets in excess of $5 million.

(June 2002 PPM at 97-98; Sept. 2003 PPM at 97-98.)

Both PPMs contain biographical information on James Sullivan, Vice President of Business Development; however, Sullivan left Pinnacle in August 2003.

### 5.      Pinnacle's Acceptance of the Subscription Agreements

6

Levine avers that he countersigned the Subscription Agreements as soon as Pinnacle received copies signed by AFM.  The copies of the four Subscription Agreements filed by Pinnacle all bear the signature of Levine, dated October 21, 2003.  He claims that he handed countersigned copies of all four Subscription Agreements to Schneider during the third week of October 2003.  Pinnacle retained a set of copies of the Subscription Agreements signed only by AFM and a set of fully executed copies.

Schneider avers that AFM never received fully signed and accepted copies of the last three Subscription Agreements until November 22, 2004.  The copies of page 7 of the second, third, and fourth Subscription Agreements attached to the Second Amended Complaint do not bear Pinnacle's signature.

### 6.  AFM's Payments

On October 20, 2003, AFM sent a $60,000 payment to Pinnacle for the first Subscription Agreement.  AFM has not made any of the remaining $420,000 payments on the last three Subscription Agreements.

### 7.  Oral Agreement

AFM admits that it agreed to unconditionally purchase $60,000 worth of Pinnacle stock in the first Subscription Agreement, but asserts that it did not agree to unconditionally pay for the shares bought in the three later-dated agreements. Instead, Pinnacle verbally promised that AFM was not obligated to pay for those

shares until it received revenue from mortgage customers supplied by Pinnacle through a web site that it would develop for AFM.  For each mortgage commission that AFM received from a Pinnacle-supplied customer, AFM would buy four hundred dollars' worth of additional Pinnacle stock.

Levine denies that any side deal ever existed.

### 8.    The Parties' Actions After October 2003

During November and December 2003 and early January 2004, Pinnacle sent multiple communications to AFM commenting on its defaulted Subscription Agreements and discussing development of AFM's web site.

On January 23, 2004, Schneider sent a letter to Levine requesting that Pinnacle

> continue to work on my AFM web site that you have built based on my and AFM funding Pinnacle Communications with my 3 outstanding subscription agreements totally $420,000.

> I've also asked that you keep the web site up and operational so that I can send out a 500,000 e-mail campaign blast, in which proceeds will go to fulfill my defaulted subscription agreements.

On February 6, 2004, Pinnacle filed this lawsuit against AFM and Schneider.

On March 10, 2004, Schneider sent a letter to AFM's attorney entitled

"Recission [sic] of Subscription Offer."  The letter stated:

> Please accept this letter as notice of American Family Mortgage Corporation's ("AMF") recission [sic] of its offer to purchase those shares in Pinnacle Communication International, Inc., as more fully set forth in those subscription documents dated November 15, 2003;

8

December 15, 2003 and January 10, 2004.  As you know, these
subscription offers were executed by AMF but were never
countersigned by you or any other duly authorized officer or agent of
Pinnacle.

### 9.    Other Pinnacle Investors

In March 2002, Pinnacle filed a Form D with the Securities and Exchange

Commission claiming an exemption from the public registration requirement for

the private offering at issue in this lawsuit.  The Form D states that two non-

accredited investors purchased stock from Pinnacle.  However, that same form

also states that Pinnacle had not sold, and did not intend to sell, to non-accredited

investors.  Jared Rothenberger, another Pinnacle marketing representative, avers

that Levine indicated that Pinnacle would sell stock to some non-accredited

investors.

### B.    Procedural History

On February 24, 2005, Pinnacle filed its Second Amended Complaint

against AFM and Schneider alleging Count I, Breach of Contract (against AFM),

Count II, Promissory Estoppel (against AFM), Count III, Fraud (against AFM and

Schneider), and Count IV, Indemnification (against AFM and Schneider).

In their Amended Answer, Affirmative Defenses, Counterclaim, and Third

Party Complaint, AFM and Schneider assert the following affirmative defenses:

1) rescission by March 2004 letter; 2) setoff; 3) expiration of offer; 4) AFM's

qualification to purchase unregistered securities; 5) failure of conditions

precedent; 6) Pinnacle's material breach; 7) fraudulent inducement; 8) duress; 9) lack of consideration; 10) lack of acceptance by Pinnacle; 11) material breach of oral agreement; and 12) violation of state and federal securities laws.

Defendants also assert counterclaims against Pinnacle and third-party claims against Levine: Count I, Rescission (against Pinnacle), Count II, Fraud in the Inducement (against Pinnacle and Levine), Count III, Negligent Misrepresentation (against Pinnacle and Levine), Count IV, Sale of Unregistered Securities (against Pinnacle and Levine), Count V, Sale of Unregistered Securities Under State Law (against Pinnacle and Levine), Count VI, Violations of Federal Securities Law (against Pinnacle and Levine), Count VII, Violations of State Securities Law (against Pinnacle and Levine), and Count VIII, Breach of Contract (against Pinnacle and Levine).

Pinnacle now requests that the Court enter summary judgment in favor of Pinnacle on its claims against Defendants and dismiss all counterclaims and third-party claims asserted by Defendants. Defendants request that the Court grant summary judgment on all claims in their favor.

## III.   DISCUSSION

### A.   Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue of

material fact.  <u>Celotex</u>, 477 U.S. at 323.  Summary judgment is only appropriate

when "there is no dispute of fact and where there exists only one conclusion."

<u>Crawford v. Runyon</u>, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.    Choice of Law: Application of Minnesota or Florida Law to Non-federal Claims

The Shareholders Agreement states:

> The corporate law of the State of Florida shall govern all issues and questions concerning the relative rights of the Company and its shareholders.  All other issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Florida, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Florida or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Florida.

(Shareholders Agreement ¶ 17.)  Additionally, each Subscription Agreement

states: "The Subscription Agreement shall be enforced, governed, and construed

in all respects in accordance with the laws of the state of Florida."  (Subscription

Agreement ¶ 9.)

A court sitting in diversity applies the choice of law requirements of the

forum state, and "Minnesota generally recognizes choice of law clauses."

11

<u>Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.</u>, 111 F.3d 1386, 1392-93 (8th Cir. 1997) (citation omitted).  Even a narrow choice of law provision, stating that the contract "shall be deemed entered into within and shall be governed by and interpreted in accordance with the laws of" a particular state, will govern tort claims arising out of the parties' performance under the contract or closely related to the interpretation of the contract, including claims of fraud in the inducement or misrepresentation.  <u>Id.</u> at 1392-93.

In this case, the choice of law provision is broader than that in <u>Astraea</u>, covering "all issues and questions concerning the relative rights of the Company and its shareholders" and "[a]ll other issues and questions concerning the construction, validity, interpretation and enforceability" of the written contracts. Under the choice-of-law provision, Florida law applies to claims based on the contract or performance of the contract, such as claims for breach of contract or rescission.  The broad language of the choice-of-law provision also covers tort claims related to the creation, validity, and performance of the contract - such as fraud in the inducement and negligent misrepresentation.  Thus, the Court applies Florida law to all claims, counterclaims, and third-party claims, other than claims based on federal securities law.  However, the Court notes that the application of Minnesota law would not change the outcome on any claim.

## C.    Summary of Claims

Pinnacle asserts that its claims simply constitute a collection action based on AFM's breach of contract.  A breach of contract claim requires a valid contract, material breach of that contract, and damages caused by the breach.  <u>J.J. Gumberg Co. v. Janis Servs., Inc.</u>, 847 So.2d 1048, 1049 (Fla. Ct. App. 2003). Defendants' affirmative defenses, counterclaims, and third-party claims are based on the parties' actions throughout the negotiation, formation, and performance of the contract for sale of Pinnacle's stock.

## D.    Contract Formation

### 1.    Expiration of Offer (Defendants' Third Affirmative Defense)

Defendants claim that no valid contract was formed between Pinnacle and AFM because Pinnacle's offer to sell shares expired before AFM signed the Subscription Agreements in October 2003.  The undisputed evidence demonstrates that Pinnacle's Board of Directors voted to extend the time period for the private offering through the end of 2003.  However, the determination of whether the extension of the offer through October 2003 was communicated to AFM depends on which version of the PPM AFM received.  The June 2002 version of the PPM states that it could be extended until the end of September 2003.  The September 2003 PPM states that it could be extended through December 2003.

If AFM received the June 2002 PPM, then even though Pinnacle voted to extend the offering, the PPM did contain an indication that the offering presented to AFM had already expired.  The contract would contain contradictory and ambiguous language regarding whether Pinnacle presented an expired offer to AFM.  On the other hand, if AFM received the September 2003 PPM, then the offer had not expired in October 2003.  The issue of which PPM was given to AFM and on which date the offer expired is a question of material fact to be resolved by the jury.

**2.    Lack of Acceptance by Pinnacle (Defendants' Tenth Affirmative Defense) and Failure of Conditions Precedent (Defendants' Fifth Affirmative Defense)**

Defendants argue that Pinnacle never signed and accepted the Subscription Agreements; thus, AFM's obligation to purchase Pinnacle's shares were never triggered.  Alternatively, they claim that AFM withdrew its offer before Pinnacle accepted it.

The Subscription Agreements state:

I understand that the Corporation [Pinnacle] reserves the right to accept or reject this subscription, in whole or in part, and to withdraw its offer to sell the Shares at any time before the issuance thereof.  This subscription shall be deemed accepted by the Corporation only when the Corporation either deposits a copy of the Subscription Agreement executed on behalf of the Corporation, or other notice of acceptance, in the United States Mail, delivers the same by hand or transmits the same by facsimile to me.

(Subscription Agreement ¶ 15. )  Above the signature line for Levine, as president

14

of Pinnacle, the Subscription Agreements state:

> THIS SUBSCRIPTION AGREEMENT WILL NOT BECOME EFFECTIVE
> UNTIL IT IS COUNTERSIGNED BELOW BY A DULY AUTHORIZED
> OFFICER OF THE CORPORATION.

> Acceptance and Agreed

(Id. at 7.)

After this lawsuit was filed, by letter dated March 10, 2004, Schneider purported to rescind AFM's offer to purchase the shares in the three later-dated Subscription Agreements because Pinnacle had failed to deliver countersigned documents to AFM.

There is fact question regarding whether Pinnacle presented countersigned copies of the three later-dated Subscription Agreements to AFM before AFM attempted to withdraw its offer to buy Pinnacle shares. However, this issue is not material, because Pinnacle transmitted "other notice of acceptance" to AFM before AFM sent the rescission letter.

An acceptance is "a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." Pezold Air Charters v. Phoenix Corp., 192 F.R.D. 721, 725 (M.D. Fla. 2000) (quoting Restatement (Second) of Contracts § 50 (1979)). On November 26, 2003, Levine wrote an e-mail to Schneider addressing Pinnacle's development of a web site for AFM and the four Subscription Agreements. Levine wrote that on October 8, 2003, Jesh

"delivered subscription agreements from [Schneider] in the amount of $60,000 for October 15, $60,000 for November 15th, $60,000 for December 15th, and $300,000 for January 10th. We booked those transactions as completed, not based upon any contingencies." The Court concludes that the statement that Pinnacle had "booked those transactions as completed" is an unambiguous indication that it had accepted the three later Subscription Agreements.

Furthermore, on December 1, 2003, Levine again e-mailed Schneider regarding AFM's web site and the funding of the Subscription Agreements. Levine expressed concern that AFM had failed to fund the later three Subscription Agreements and stated that those "subscription agreements have been booked." Another letter from Levine to Schneider, dated December 3, 2003, reiterated that the agreements "did not contain any written clauses or contingent statements for the completion of funding." Schneider did not respond to the letter. Finally, on January 9, 2004, Levine again e-mailed Schneider, stating that the November 15 and December 15 Subscription Agreements are "not funded and in default" and referring to them as "executed subscription agreements."

The above communications unambiguously demonstrate Pinnacle's acceptance of AFM's offer to buy the shares. Thus, the Court grants Pinnacle's motion for summary judgment on these affirmative defenses.

### 3.      Lack of Consideration (Defendants' Ninth Affirmative Defense)

In their Amended Answer, Defendants assert that the Subscription Agreements fail for lack of consideration. They have not further addressed this affirmative defense. Pinnacle offered 160,000 shares of stock in exchange for the Subscription Agreements. The Court grants Pinnacle's motion for summary judgment on this affirmative defense.

### E.      Validity of the Contract

#### 1.      AFM's Eligibility to Purchase Shares (Defendants' Fourth Affirmative Defense)

Defendants claim that AFM was not qualified to purchase unregistered securities because it was not an accredited investor - that is, a corporation not formed for the specific purpose of acquiring the shares and with total assets of more than $5,000,000. <u>See</u> 17 C.F.R. § 230.501(a)(3). Thus, Defendants argue, the Subscription Agreements were not valid.

AFM is estopped from claiming that it did not qualify for the purchase of unregistered securities after it affirmed in writing, at the time that the subscriptions were entered into, that it did qualify. <u>See</u> <u>Faye L. Roth Revocable Trust v. UBS Painewebber, Inc.</u>, 323 F. Supp. 2d 1279, 1301 (S.D. Fla. 2004) (holding that investors "cannot disavow their representations [in the Investor Application] that they were accredited investors"); <u>Goodwin Props., LLC v. Acadia Group, Inc.</u>, No. 01-49-P-C, 2001 WL 800064, at *7 (D. Me. July 17, 2001) (unpublished) (holding that when investors represent in writing at the time of the

17

investment that they are accredited investors as defined by 17 C.F.R.

§ 230.501(a), "[t]hey cannot now disavow those representations in order to

support their claims against the [issuers]").

Additionally, Rule 501 of the SEC regulations provides that accredited

investors are either those corporations with over $5,000,000 in assets and not

formed for the purpose of acquiring the shares or "who the issuer reasonably

believes" to fit those requirements.  17 C.F.R. § 230.501.  It is sufficient that

Pinnacle reasonably believed AFM to be an accredited investor.

Defendants also argue that Schneider did not sign the accreditation

affirmation on page four of the three later-dated Subscription, so AFM is not

bound by that representation.  The question of whether Schneider's signatures on

pages four and eleven of the later-dated Subscription Agreements are original is a

factual dispute; however, the issue is not material.  Even if Schneider only signed

pages four and eleven once on the date in October 2003 when he signed all four

contracts, he admittedly represented to Pinnacle, in writing, that AFM was a

qualified investor.  Whether he represented that once or four times is not relevant

to whether AFM should be estopped from now asserting that it is not qualified.

AFM is bound by its one admitted representation.  The Court dismisses

Defendants' Fourth Affirmative Defense.

### 2.     Violation of Securities Laws: Failure to Register

#### a.     Failure to Register Under Federal Law (Defendants' Twelfth Affirmative Defense, Counterclaim Count IV)

##### i.     Federal Registration Requirements

The parties agree that Pinnacle did not have a registration statement in effect for the offering at issue in this lawsuit.  The Securities Act of 1933 requires registration of stocks issued to the public.  15 U.S.C. § 77e.  Under safe harbor provisions of the Act, the registration requirement does not apply to "transactions by an issuer not involving any public offering."  15 U.S.C. § 77d(2).  Regulation D clarifies this safe harbor exemption under Rules 504, 505, 506, and 508.

Pinnacle claims that its private placement complied with the requirements of Rules 505, 506, and 508.  It filed a Form D with the SEC claiming the exemption under Rule 506.  Both Rules 505 and 506 contain a number of requirements.  However, based on the evidence before the Court and the positions of the parties, only one requirement is at issue here, and it is contained in both Rules: if the issuer sells stock to purchasers who are not "accredited," it must provide certain information to those purchasers, including audited financial statements.  17 C.F.R. §§ 230.501, .502, .505, .506.

Defendants assert that Pinnacle sold stock to non-accredited investors without providing the required information, violating Pinnacle's exemption from

securities law, voiding the entire offer, and entitling all investors to rescission.  If

an offering purports to be private and exempt from registration, but, in fact,

should have been registered, then the failure to register gives rise to a rescission

claim under 15 U.S.C. § 77l(a)(1).  <u>In re JWP Inc. Sec. Litig.</u>, 928 F. Supp. 1239,

1259 (S.D.N.Y. 1996).

Defendants claim that Pinnacle's offering did not qualify for the Rule 505 or

Rule 506 exemptions because both exemptions require a Rule 502 audited balance

sheet for unaccredited investors.  They assert that Pinnacle sold to at least two

unaccredited investors.  Under Rule 502(b)(1), if the issuer sells securities under

Rule 505 or 506 to any purchaser that is not an accredited investor, the issuer

shall furnish the information specified in paragraph (b)(2) to the purchaser a

reasonable time prior to sale.  17 C.F.R. § 230.502(a)(1).  Paragraph (b)(2)

requires an audited balance sheet, dated within 120 days of the start of the

offering.  <u>Id.</u> § 230.502(b)(2)(B)(1), (2).  The PPMs used by Pinnacle in this

offering contained no audited balance sheets.  If sales were made to unaccredited

investors, the Rule 505 and 506 exemptions do not apply.  If Pinnacle only made

sales to accredited investors, there was no need to furnish financial statements to

investors.

### ii.     Whether All Investors Were Accredited

An investor is accredited if he is a natural person with an individual income

over $200,000, or with a joint income over $300,000, per year during the previous

two years or a net worth of $1,000,000, or if it is a corporation not formed for the

specific purpose of acquiring the securities offered, possessing over $5,000,000 in

assets.  17 C.F.R. §§ 230.501(a)(3), (5), (6).  According to Pinnacle, all investors

affirmed in writing that they were accredited.  Defendants rely on two types of

evidence to establish that Pinnacle sold to unaccredited investors: the affidavits of

Schneider, Jesh, and Rothenberger and Pinnacle's Form D.

### aa.    Jesh and Rothenberger Affidavits

Schneider, Jesh, and Rothenberger aver that Pinnacle made sales to

unaccredited investors.  Pinnacle moves to strike portions of their affidavits as

conclusory hearsay.  It moves to strike Paragraph 4 of the October 28, 2005

Rothenberger Affidavit; Paragraph 10 of the October 31, 2005 Jesh Affidavit;

Paragraph 11 of the February 11, 2005 Jesh Affidavit; Paragraph 10 of the

October 27, 2005 Schneider Affidavit; and Paragraph 11 of the February 9, 2005

Schneider Affidavit.  (Paragraph 10 of the October 27, 2005 Schneider Affidavit is

substantially identical to Paragraph 11 of the February 9, 2005 Schneider

Affidavit.)

The Court will strike those portions of the affidavits that provide no basis for

the affiants' knowledge that Pinnacle made sales to unaccredited investors.  See

Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on

personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."); <u>Larimer v. Int'l Bus. Machs., Corp.</u>, No. 02 C 3160, 2003 WL 21000382, at *4 (N.D. Ill. May 1, 2003) (unpublished) (striking portion of affidavit in which affiant comments on company's financial condition when affiant failed to present the foundation for his knowledge of that information).

Rothenberger avers that when he was considering investing in Pinnacle, Levine told him that Pinnacle's offering would have a certain percentage of investors who were not qualified and were worth less than one million dollars. (Rothenberger Aff. ¶ 2.)  During his deposition, he further testified that several of his family members and friends, who were Pinnacle investors, were not worth one million dollars.  In his Affidavit, Rothenberger avers:

> I am personally aware that several of the investors in Pinnacle stock clearly did not meet the criteria to be a qualified investor.  On the attached list of Pinnacle investors I have highlighted those persons that did not qualify for either the net worth or net income criteria to be qualified investors.  I fully anticipate that many of these individuals, who are very dissatisfied with this investment, will be willing to come to court to testify regarding their purchase of the stock from Mr. Levine.

(Rothenberger Aff ¶ 4.)

Rothenberger does not state the basis for being "personally aware that several of the investors . . . did not meet the criteria to be a qualified investor." Simply being related to or acquainted with several of the investors is not a

sufficient basis for personal knowledge.  He also does not state the basis for his

knowledge that the listed investors are dissatisfied with their investment or that

they would be willing to testify.  Because Paragraph 4 consists of Rothenberger's

unsupported opinions, not based on personal knowledge, the Court strikes this

paragraph.

However, Rothenberger's averment that Levine told him "that in his stock

offering there was room for a certain percentage of non-vested or qualified

investors [and] indicated he could have a certain percentage of people invested

that were not worth a million dollars," is admissible.  (Id. ¶ 2.)  This statement is

based on Rothenberger's personal knowledge because Levine spoke directly to

him.  It is not hearsay because it is a statement of a party-opponent offered against

him.  Fed. R. Evid. 801(d)(2).

Paragraph 10 of the October 31, 2005 Jesh Affidavit states:

> Affiant brought Mr. Levine several other potential investors in
> addition to American Family.  Affiant was present on several
> occasions during Mr. Levine's sales presentation to these potential
> investors.  Never did I hear Mr. Levine question the potential
> investors whether they met the investor qualifications in the PPM.
> Affiant knows for a fact that Mr. Levine and Pinnacle sold stock in the
> Private Placement offering to many individuals that did not meet the
> net worth or gross income financial criterial in the PPM.  Attached to
> this Affidavit is a list of Pinnacle investors.  Affiant has high-lighted
> those persons that Affiant knows were not close to meeting the
> financial criteria required to be qualified investors.  From Affiant's
> discussions with many of these unhappy investors, they will willingly
> come to court and testify as to their net worth and gross income and
> that Mr. Levine was not concerned if they were qualified investors.

23

Jesh does not state the basis for his knowledge that he "knows for a fact that Mr. Levine and Pinnacle sold stock in the Private Placement offering to many individuals" who were not accredited. Nor does he state how he knows that certain investors "were not close to meeting the financial criteria required." Further, Jesh's assertions regarding unhappy investors' proposed testimony is pure hearsay. Thus, the Court strikes all but the first three sentences of Paragraph 10.

Similarly, the Court disregards the first sentence of Paragraph 11 of Jesh's February 11, 2005 Affidavit in which he states: "Affiant is now personally aware that Mr. Levine and Pinnacle sold stock in the Private Placement offering to many individuals that did not meet the financial criteria in the Private Placement Memorandum." Jesh provides no basis for his knowledge.

In Paragraph 10 of Schneider's October 7, 2005 Affidavit, he states: "Affiant has become aware that it was routine for Mr. Levine and Pinnacle in soliciting investors for this Private Placement, to not require investors to meet, or come close to the qualified investor requirements of the Private Placement Memorandum." The Court strikes Paragraph 10 because it provides no basis for his knowledge that Levine routinely did not require investors to meet accreditation requirements. For the same reason, the Court strikes Paragraph 11 of the February 9, 2005 Schneider Affidavit.

### bb.    Form D

24

The March 22, 2002 Form D, a formal, publicly filed document, lists two unaccredited investors in Pinnacle's offering. Pinnacle argues that the references to unaccredited investors are clerical errors, corrected in its 2005 Amended Form D. It notes that Defendants are unable to specifically identify any non-accredited investors.

There is a genuine issue of material fact regarding whether Pinnacle sold to unaccredited investors. The Form D may have contained a mere clerical error; however, the mistake appears on multiple separate pages, along with a listing of the amount of money the non-accredited investors invested. Additionally, the Form D was signed by Levine. The decision of how much weight to give this document in the face of Levine's contradictory affidavit is best left to the jury.

### iii.    Information Provided

If Pinnacle sold to unaccredited investors, its offering was not exempt because it did not provide a recent audited balance sheet, or any approximation of one, to them. There is a genuine question of material fact regarding whether Pinnacle met the Rule 505 or Rule 506 exemption.

### iv.    Rule 508 Exemption

Pinnacle asserts, in the alternative, that its offering was exempt under Rule 508. This catch-all rule provides:

a) A failure to comply with a term, condition or requirement of § 230.504, § 230.505 or § 230.506 will not result in the loss of the

25

exemption from the requirements of section 5 of the Act for any offer or sale to a particular individual or entity, if the person relying on the exemption shows:

(1) The failure to comply did not pertain to a term, condition or requirement directly intended to protect that particular individual or entity; and

(2) The failure to comply was insignificant with respect to the offering as a whole, . . . and

(3) A good faith and reasonable attempt was made to comply with all applicable terms, conditions and requirements of § 230.504, § 230.505 or § 230.506.

17 C.F.R. § 230.508.

Pinnacle argues that it prepared a thorough private placement memorandum, limited stock issuance to investors who affirmed in writing that they met accreditation requirements, raised less than $5 million, and did no general solicitation. Thus, it asserts that any minor violation of Rule 505 or 506 by listing two non-accredited investors on its Form D was insignificant and was not violation of a rule intended to affect AFM. It claims it reasonably attempted to comply with Rules 505 and 506 in good faith.

The issue of whether Pinnacle sold stock to unaccredited investors, as indicated by the original Form D and Levine's statements to Rothenberger, and thus, violated its claim of exemption under Rules 505 or 506 is a genuine question of material fact, best decided by the jury. It is clear that, if Pinnacle sold to non-accredited investors, it did not supply the required information, namely, an

audited balance sheet.  Similarly, whether, if that violation occurred, it occurred in good faith, is also best decided by the jury.  The Court denies summary judgment on Defendants' Twelfth Affirmative Defense and Counterclaim Count IV.

### b. Failure to Register Under State Law (Defendants' Twelfth Affirmative Defense, Counterclaim Count V)

Both in their affirmative defenses and in Claim V of their counterclaims, Defendants assert that Pinnacle violated state securities laws by selling unregistered securities.  Under 15 U.S.C. § 77r, federal securities law preempts state registration requirements for offerings that are exempt as transactions "not involving any public offering," except to the extent that a state has "notice filing requirements that are substantially similar to those required by rule or regulation under section 77d(2) of this title."  15 U.S.C. §§ 77d(2), 77r(b)(4)(D).  Additionally, Minnesota and Florida law specifically exempt federally-covered securities from their coverage.  Fla. Stat. § 517.07(1); Minn. Stat. § 80A.08.  The federal statute was intended to preempt state registration requirements and make the federal government "the exclusive regulator of national offerings of securities."  Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 108 (2d Cir. 2001); Zuri-Invest AG v. Natwest Fin., Inc., 177 F. Supp. 2d 189, 192 (S.D.N.Y. 2001) (citation omitted).

When an offering purports to be exempt under federal Regulation D, any allegation of improper registration is covered exclusively by federal law.  See

Temple v. Gorman, 201 F. Supp. 2d 1238, 1243-44 (S.D. Fla. 2002) (holding that when a private placement of securities purported to be exempt under Rule 506, "[r]egardless of whether the private placement actually complied with the substantive requirements of Regulation D or Rule 506, the securities sold to Plaintiffs are federal 'covered securities' because they were sold pursuant to those rules [and] [a]s a result, Fla. Stat. § 517.07 does not require registration of such securities").  Accord Lillard v. Stockton, 267 F. Supp. 2d 1081, 1116 (N.D. Okla. 2003).

Defendants state law failure-to-register claim is preempted because Pinnacle purported to sell its stock under the Rule 506 exemption.  Therefore, the Court dismisses their fifth counterclaim and the any affirmative defense based on failure to register under state law.

### 3. Duress (Defendants' Eighth Affirmative Defense)

In their Amended Answer, Defendants claim that the January 23, 2004, letter from Schneider requesting that Pinnacle continue to work on the AFM web site is void because it was written under duress.  Defendants do not further address this defense.  Pinnacle is not attempting to enforce the January 2004 letter as a contract.  Thus, the Court dismisses Defendants' Eighth Affirmative Defense.

28

### F.   Breach of Subscription Agreements

#### 1.   Pinnacle's Failure to Deliver Shares (Defendants' Sixth Affirmative Defense, Counterclaim Count VIII)

Defendants assert that Pinnacle had a duty to timely provide AFM its stock shares under the Subscription Agreement, but did not provide shares due under the first Subscription Agreement until this lawsuit was filed.  They claim that Pinnacle's delay constituted a material breach of the Subscription Agreements and relieved AFM of any further obligations under the later-dated Subscription Agreements.

Neither the PPM nor the Shareholders Agreement require Pinnacle to send stock certificates to an investor before the private placement has closed and all funds have been collected.  Schneider admitted that no one from Pinnacle told him that he would receive stock certificates when he sent money; rather, that was simply his "own impression" based on previous transactions with other issuers. There is no evidence that Pinnacle had an obligation to provide the stock certificates to AFM upon AFM's payment.  The defense and counterclaim are dismissed.

#### 2.   Negligent Misrepresentation (Counterclaim Count III)

Defendants assert that various statements and omissions made by Levine during the initial October 2003 meeting with Schneider and statements and omissions found in the PPM constitute negligent misrepresentations.  Under

Florida law,

> [t]o prove negligent misrepresentation, it must be shown that (1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation.

Baggett v. Electricians Local 915 Credit Union, 620 So.2d 784, 786 (Fla. Ct. App. 1993) (citation omitted).  The party asserting fraud has the burden of showing each of these elements.  Rudy's Glass Constr. Co. v. Robins, 427 So.2d 1051, 1052 (Fla. Ct. App. 1983).

Because there is no evidence that the following statements were false or that Pinnacle or Levine knew or should have known of the statements' falsity or had no knowledge of their truth or falsity, the Court dismisses the negligent misrepresentation claim to the extent it is based upon these statements:

> "Pinnacle had long term debt of only approximately $150,00.00." (Defendants' Countercl. ¶ 9(a).)

> "Pinnacle only needed approximately $360,000.00 in order for the company to be up and running and profitable."  (¶ 9(b).)

> "Levine had a relationship with the Minnesota teachers union which Levine would use to get AFM leads."  (¶ 9(c).)

> "Levine invested over $2.4 million dollars of his own money into the company."  (¶ 9(d).)

> "Levine personally had the idea for and started the website company 'Shop4zero.'" (¶ 9(e).)

"Levine has never taken a salary from Shop4zero."  (¶ 9(f).)

"AFM could expect a 110-125% return on its investment within 30-90 days."  (¶ 9(g).)

The Court now turns to the two remaining misrepresentations and the alleged omissions.

### a.    Representations in the PPM

Schneider admits that he did not read and did not rely on any of the representations made in Pinnacle's PPM when deciding to invest.  Reliance is a required element of common law negligent misrepresentation.  Because Schneider testified that he did not rely on any misrepresentation contained within the PPM when signing the Subscription Agreements, the Court grants Pinnacle's motion for summary judgment on Defendants' negligent misrepresentation counterclaim based on any statements in the PPM.

### b.    Levine's Oral Representations

Defendants could not have reasonably relied on any oral representation not contained in the integrated written agreement, even if those oral representations were false.  Hazara Enters., Inc. v. Motiva Enters., LLC, 126 F. Supp. 2d 1365, 1374 (S.D. Fla. 2000) ("It is deemed unreasonable as a matter of law to rely upon oral statements, even if falsely made, where a written contract subsequently executed does not contain the alleged representations.").  When a written contract contains an integration clause, it puts the contracting party on notice

31

that the contractual relationship "would be exclusively controlled by the terms of the written contract between the parties."  Id.  In this case, the Shareholders Agreement contains an integration clause.  Additionally, each of the four Subscription Agreements declares that there were no oral or written representations made to AFM that were in any way inconsistent with the PPM.

Due to these contract clauses, Defendants cannot show justifiable reliance on any misrepresentations not contained in the PPM, Shareholders Agreement, or Subscription Agreements.  The allegation that Pinnacle would create a web site for AFM to market its mortgage services to a Minnesota teachers union is not contained in any written document.  Defendants' negligent misrepresentation claim based on this statement fails.

The PPM does contain one of the alleged oral misrepresentations: that Sullivan was a current Pinnacle employee.  Defendants have offered evidence that this statement was untrue in October 2003.  In order to succeed on a negligent misrepresentation claim based on this alleged oral misrepresentation, Defendants must further show that the misrepresentation was material and that they justifiably relied upon it.  They have offered proof of neither.  Accordingly, their claim cannot succeed based upon this allegation.  In sum, Defendants cannot succeed on a negligent misrepresentation claim based on any affirmative misrepresentation.

### c.    Claims Based on Alleged Omissions

Defendants assert five alleged omissions by Pinnacle:

a.    That Pinnacle has liens and judgments against it;

b.    That Pinnacle is involved in a lawsuit(s) currently;

c.    Levine filed bankruptcy;

d.    There have been 4-5 previously failed launches or rollouts of S4Z without success;

e.    The tax liabilities.

(Countercl. ¶ 11.)

Two of these alleged omissions were revealed in the PPM:  Levine's personal bankruptcy was revealed in both the September 2003 PPM and the June 2002 PPM.  Likewise, Pinnacle's tax liabilities were listed in both versions of the PPM.  Defendants offer no evidence that these disclosures were misleading or incomplete.  Any claim based on these alleged omissions is dismissed.

Pinnacle submits evidence that there were no liens against it as of October 2003.  Defendants offer no evidence to dispute Pinnacle's position.  Pinnacle had no duty to reveal liens that did not exist.  Any claim based on this alleged omission is dismissed.

Pinnacle also offers evidence that there have never been four or five previously failed launches or rollouts of Shop4zero.  Defendants offer no evidence to the contrary.  Any claim based on this alleged omission is dismissed.

Pinnacle bears the burden of showing that any omissions were material. As of October 2003, there were three judgments against Pinnacle - for $1,500, $3,600, and $6,900. Pinnacle claims that these amounts are too minimal to be material. Defendants offer no evidence to show that the omission was material. The Court dismisses the claim based on the omission of judgments.

Pinnacle made lawsuit disclosures in the September 2003 PPM. The June 2002 PPM submitted by Defendants does not contain the lawsuit disclosures. However, AFM has failed to submit any evidence that omission of the lawsuit information was material. The Court dismisses the claim based on omission of lawsuit information.

In conclusion, the Court dismisses Defendants' claim for negligent misrepresentation because they cannot succeed on any of the alleged omissions or misrepresentations.

### 3.   Securities Fraud

#### a.   Federal Securities Fraud (Counterclaim Count VI)

Defendants assert a counterclaim for federal securities fraud based upon the same misrepresentations and omissions discussed above. In order to succeed on such a claim, Defendants need to demonstrate the following elements:

> (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the

fraudulent activity occurring in connection with the purchase and
sale of a security.

In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 888 (8th Cir. 2002).  The Court

determines that Defendants are unable to meet all four elements on any of the

claimed misrepresentations or omissions.

As analyzed in the previous section, Defendants cannot show the falsity or

misleading nature of many of the alleged misrepresentations or omissions.  As to

the remaining allegations, Defendants have not offered evidence that Pinnacle's

alleged misrepresentations or omissions were made with the required scienter.  A

Rule 10b-5 federal securities claim require affirmative proof of scienter: reckless or

intentional behavior by the issuer of the securities.  Ernst & Ernst v. Hochfelder,

425 U.S. 185, 193 (1976); In re Acceptance Ins. Cos. Sec. Litig., 423 F.3d 899, 904

(8th Cir. 2005).

As discussed previously, Defendants have also failed to provide evidence of

justifiable reliance on any misrepresentation.  "Justifiable reliance is not a theory

of contributory negligence; rather, it is a limitation on a rule 10b-5 action which

insures that there is a causal connection between the misrepresentation and the

plaintiff's harm."  Atari Corp. v. Ernst & Whinney, 981 F.2d 1025, 1030 (9th Cir.

1992) (quoting Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522,

530 (7th Cir. 1985) (quoting Zobrist v. Coal-X Inc., 708 F.2d 1511, 1517 (10th Cir.

1983))).  See also Rissman v. Rissman, 213 F.3d 381, 383 (7th Cir. 2000) (holding

that when investor signed written agreement stating that he has not relied on prior oral statements when making his investment decision, "[s]ecurities law does not permit a party to a stock transaction to disavow such representations--to say, in effect, 'I lied when I told you I wasn't relying on your prior statements' and then to seek damages for their contents").  Nor have Defendants submitted proof of the materiality of any misrepresentation or omission, apart from the web site allegation, upon which they were not justified in relying.

For all of the above reasons, Defendants' federal securities fraud claim cannot survive summary judgment and is dismissed.

### b.    State Securities Fraud (Counterclaim Count VII)

A successful claim for securities fraud under Florida Statute 517.301, "requires that the plaintiff prove (1) a misstatement or omission (2) of a material fact (3) [negligently made] (4) upon which the plaintiff relied (5) that proximately caused the plaintiffs' loss."  Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042, 1046 (11th Cir. 1987).  The plaintiff must show justifiable reliance on the alleged misrepresentation.  In re Sahlen & Assocs., Inc. Sec. Litig., 773 F. Supp. 342, 371 (S.D. Fla. 1991).  (Justifiable reliance is also a required element of a Minnesota securities fraud claim.  Davidson v. Wilson, 973 F.2d 1391, 1401 (8th Cir. 1992).)

For the reasons explained in the Court's analysis of Defendants' negligent

36

misrepresentation counterclaim, which requires all of the pertinent elements of the Florida securities fraud claim, the Court dismisses the state law securities fraud claim.

### G.     Breach of Oral Agreement

Defendants assert a group of counterclaims and affirmative defenses based on AFM's allegation that it entered an oral side agreement with Pinnacle, under which AFM was not required to immediately pay on the Subscription Agreements as explicitly stated in the Subscription Agreements.  Instead, AFM would pay Pinnacle four hundred dollars per commission that it received through a web site that Pinnacle would design to assist AFM in selling mortgages.

### 1.     Pinnacle's Material Breach of the Oral Agreement (Defendants' Eleventh Affirmative Defense)

Defendants assert that Pinnacle materially breached the oral agreement because it failed to maintain AFM's web site and eventually shut down the site completely.  They argue that this breach relieved AFM of any obligations under the three later-dated Subscription Agreements.

The parol evidence rule bars evidence of the alleged oral agreement.  Under Florida law, "evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid [final and complete] contract." Ungerleider v. Gordon, 214 F.3d 1279, 1282 (11th Cir. 2000) (citations omitted).

The oral agreement alleged by AFM directly contradicts the written agreements. The alleged oral agreement provides that AFM was only required to pay for shares if it received mortgage commissions through a web site created by Pinnacle, and, if so, only in four hundred dollar installments. The Subscription Agreement states that full payment was due by check as soon as AFM executed the Subscription Agreements and returned them to Pinnacle. Additionally, the Subscription Agreements contain representations that AFM did not receive an oral promise that contradicted them, and the Shareholders Agreement contains an integration clause. Under the parol evidence rule, evidence of the oral agreement is inadmissible.

Defendants' assertion of the frustration of purpose doctrine does not vary the result. The alleged oral promise directly contradicts the main terms of the written agreement: that AFM would pay in full for all shares upon return of the executed contracts. The frustration of purpose doctrine does not apply under these circumstances. Defendants' affirmative defense is dismissed.

### 2. Fraudulent Inducement (Defendants' Seventh Affirmative Defense, Counterclaim Count II)

Defendants allege that Pinnacle fraudulently induced AFM to enter into the Subscription Agreements by making misrepresentations during the October 2003 meetings. They assert without citation to the record that they relied on those misrepresentations when deciding to purchase Pinnacle stock.

Under Florida law, the parol evidence rule applies even when there are allegations of fraud in the inducement, "where the alleged oral agreement relates to the identical subject matter embodied in the written agreement and . . . directly contradict[s] an express provision of the written agreement." Ungerleider, 214 F.3d at 1282 (quoting Linear Corp. v. Standard Hardware Co., 423 So.2d 966, 968 (Fla. Ct. App. 1982)).  Because the alleged oral contract directly contradicts the written agreement, the fraudulent inducement claim fails. To the extent that the fraud in the inducement claim is based on other alleged representations, such as those in the PPM or the employment of Sullivan, as discussed earlier, Defendants cannot show that they relied on any misrepresentation or that the misrepresentation was material.   The Court dismisses the fraudulent inducement affirmative defense and counterclaim.

### 3.    Rescission (Defendants' First Affirmative Defense, Counterclaim Count I)

AFM asserts the affirmative defense of rescission based on its March 10, 2004 rescission letter claiming that Pinnacle had failed to deliver countersigned Subscription Agreements.  The Court previously concluded that Pinnacle accepted the Subscription Agreements before AFM sent the rescission letter.  Defendants' affirmative defense is dismissed.

AFM also asserts a counterclaim for equitable rescission based on Pinnacle's alleged misrepresentations.  Under Florida law, the party seeking rescission must

establish the following elements:

> (1) character or relationship of the parties; (2) contract formation; (3) existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground; (4) rescission by one party and notification thereof to the other party; (5) offer to restore any benefits received from the contract; and (6) inadequacy of a remedy at law.

Capital Factors, Inc. v. Heller Fin., Inc., 712 F. Supp. 908, 915 (S.D. Fla. 1989)

(citation omitted).

Defendants' rescission claim appears to be based on allegations of fraud or misrepresentation. The Court has already dismissed Defendants' allegations of negligent misrepresentation and fraud. For the same reasons, the rescission counterclaim is dismissed.

### 4.   Setoff (Defendants' Second Affirmative Defense)

Defendants claim that they are entitled to a setoff for their counterclaims. The only remaining counterclaim is for sale of unregistered securities under federal law. If Defendants succeed on that claim, they could be entitled to rescission of the Subscription Agreements. Setoff would be inapplicable. The setoff affirmative defense is dismissed.

### H.   Pinnacle's Breach of Contract, Indemnification, and Promissory Estoppel Claims

The Court denies both parties' motion for summary judgment on Pinnacle's breach of contract and indemnification claims because there are genuine

questions of material fact on Defendants' affirmative defenses of expiration of the offer and on violation of federal securities registration laws. Because the validity and enforceability of the Subscription Agreements remains unresolved, the Court also denies summary judgment on Pinnacle's alternative promissory estoppel claim.

**I.     Pinnacle's Fraud Claim**

Pinnacle claims that AFM and Schneider committed fraud by falsely representing their intention to subscribe to $420,000 worth of stock when they actually did not intend to pay for the stock unless they received mortgage leads. To succeed on a claim for fraud, Pinnacle must show

> (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation.

Wadlington v. Cont'l Med. Servs., Inc., 907 So.2d 631, 632 (Fla. Ct. App. 2005) (citation omitted). Under Florida law, a contracting party who enters into a contract without the present intent to honor it has committed fraud. Noack v. Blue Cross & Blue Shield of Fla., Inc., 742 So.2d 433, 434 (Fla. Ct. App. 1999). (Minnesota law is the same. Hayes v. Northwood Panelboard Co., 415 N.W.2d 687, 690 (Minn. Ct. App. 1987).)

Pinnacle has submitted evidence that, at the time Defendants entered the

Subscription Agreements, they did not intend to pay for its stock unless they received sufficient mortgage loans.  This intent contradicts the written contract stating that AFM would provide full payment to Pinnacle upon submission of executed Subscription Agreements.  The Court denies both parties' motions for summary judgment on this claim because a determination of Defendants' intent and the reasonableness of Pinnacle's reliance on Defendants' promise is best left to the jury.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Motion for Summary Judgment and Dismissal of Counterclaims and Third Party Claims by Pinnacle Communications International, Inc. [Docket No. 78] is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The following Counterclaims and Third-Party Claims are **DISMISSED**: Counts I through III and Counts V through VIII.

   b. The following Counterclaim and Third-Party Claim remains: Count IV, Sale of Unregistered Securities.

2. Motion for Entry of Summary Judgment against American Family Mortgage Corporation and Michael Schneider by Pinnacle Communications International, Inc. [Docket No. 94] is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The Court **DISMISSES** all affirmative defenses with the exception of the third affirmative defense, expiration of offer, and the twelfth affirmative defense, violation of federal securities laws.

   b. Summary judgment is **DENIED** as to all four of Pinnacle's

claims.

3.      Motion for Summary Judgment by American Family Mortgage
        Corporation and Michael Schneider [Docket No. 102] is **DENIED**.

4.      Pinnacle's Motion to Strike Affidavits as Hearsay Testimony and
        Lacking in Foundation [Docket No. 122] is **GRANTED** as set forth in
        the body of this Memorandum.

Dated: February 27, 2006                    s / Michael J. Davis
                                            Judge Michael J. Davis
                                            United States District Court